**Opinion issued July 26, 2012**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00225-CR

———————————

**KEVIN RAY HENSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case No. 1166329**

## O P I N I O N

A jury convicted appellant, Kevin Ray Henson, of the second degree felony

offense of aggravated assault and, after finding the allegations in an enhancement

paragraph true, assessed punishment at eight years' confinement.[1]  In two issues, appellant contends that (1) he was denied his constitutional right to a speedy trial and (2) the State failed to present sufficient evidence supporting his conviction in light of evidence raising the issue of self-defense.

We affirm.

## Background

Appellant and Kevin Roberts, the complainant, had been friends since the mid-1980's.  Roberts testified that appellant and his wife were having marital difficulties during the early part of 2008; that, while they were separated, appellant's wife dated Roberts's cousin, whom she met at a Christmas party at Roberts's house; and that this relationship was a "sore spot" for appellant.  Roberts repeatedly testified that he did not approve of this relationship.  He was "positive" that the situation between his cousin and appellant's wife provided the motivation for the incident at issue.

Roberts testified that he had previously loaned appellant a vacuum cleaner, and, although appellant had returned the vacuum itself, he had not returned a hose connection for the vacuum.  On April 10, 2008, Roberts called appellant to arrange a time and a place to pick up the hose connection.  Appellant, who was at his

---

[1]    *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a) (Vernon 2011).

2

uncle's funeral at the time of this phone call, told Roberts to come by Spring Cypress Car Care, where he worked as a manager, the next day to pick up the part.

On April 11, 2008, Roberts drove to Spring Cypress Car Care. Roberts parked in front of the building, left his truck running, and opened the door to the office area of the shop. According to Roberts, appellant stood up, motioned for Roberts to follow him, and walked through the garage area to a parking lot behind the building. Roberts trailed behind appellant, and, as he reached the parking lot, he asked appellant, who was already opening the trunk of his car, "How are things going?" Appellant responded, "Same old, same old." Roberts stated that, at this time, he "had no indication that something was awry." As Roberts approached appellant's car, appellant was leaning into the trunk, trying to put the vacuum hose into its bag. Roberts then asked appellant, "What's up on your phone?," because appellant's cell phone had been off when Roberts called him on his way to the shop. Roberts also took the hose from appellant and started to put it in its bag. Appellant responded, "You're what's up on my phone." At this point, Roberts turned to look at appellant because he "knew something wasn't right."

Roberts could see that appellant had his hand in his pocket and that "there was a point in his pocket." Roberts testified, "[W]hen I went to look back at his eyes, that's when he started stabbing me, which I did not see him come at me. It was like glance and boom, boom, he's stabbing me on my back." At first, Roberts

3

did not realize that appellant was stabbing him; he only thought that appellant was hitting him in the back. Roberts hit appellant with the vacuum hose bag and tried to back away, but appellant's car was directly behind him. Roberts then grabbed either the knife or appellant's hand, and he "just sort of push[ed] [appellant] forward, lift[ed] him and slam[med] him down on the ground." Once he was on the ground, appellant "just sort of curl[ed] up." Roberts straddled him and said, "What are you doing? What are you doing? You're killing me." Appellant responded, "I know." Both Roberts and appellant then started yelling for Scott Rutledge, one of appellant's co-workers, who was working in the garage at the time.

At the time Rutledge appeared, appellant still held the knife, and when Roberts tried to grab the knife, appellant covered it with both of his hands and Roberts squeezed appellant's hands. Rutledge came over to them, appellant "somehow let[] go" of the knife, and Rutledge kicked the knife away. Roberts then stood up, walked to the front of the building, and called 9-1-1. Roberts testified that he had a total of eleven stab wounds, seven in his back, two in his left side, and two on his chest and stomach, as well as injuries to his hand from where he grabbed the knife. He stated that, by the time he called 9-1-1, he was "soaked" with blood.

4

Roberts testified that, aside from the relationship between appellant's wife and Roberts's cousin, there were "never any true issues" in his friendship with appellant. Roberts opined that appellant must have planned the attack because

> there's too many situations to where this could have been avoided. If, you know, if he wanted to give me my vacuum hose back, it could have been up front [at the shop]. He could have even gave them to me weeks before. It's like there's something was going on with, I guess, [Roberts's cousin] and [appellant's wife] and him. And I was the link. And he was just wanting to strike out.

On cross-examination, Roberts acknowledged that he was carrying a pocketknife on the day of the incident. He also acknowledged that, two months before the incident, appellant

> gave [Roberts's] wife a ride when he was drunk on his motorcycle one night. . . . But it was never a beef [with appellant]. It was, "You shouldn't do that." He shouldn't be driving drunk and he shouldn't give her a ride.

Roberts testified, however, that he did not have an argument with appellant over that issue.

Roberts denied that appellant started screaming for Rutledge because Roberts tried to stab him. Roberts also denied that he went to Spring Cypress Car Care the day before the incident to retrieve the hose connection and spoke to another employee while he was there. Roberts denied repeatedly calling and harassing appellant and his wife in the months leading up to the incident. Roberts testified that if other individuals said that he and appellant had issues, they must

5

have heard that information from appellant because, as far as he was concerned, "it was obviously him saying that we had an issue and me not knowing about it."

Rutledge testified that he knows both appellant and Roberts, who had occasionally visited the shop. Rutledge was working in the garage when Roberts arrived, said hello to him, and walked through the garage towards the parking lot with appellant. Rutledge did not immediately do anything, "but after a couple of moments [he] thought [the situation] was kind of odd," so he followed appellant and Roberts "to hear or see what was going on." Rutledge saw both of them standing by an open car trunk, and "[n]othing seemed out of the ordinary." Rutledge returned to the garage.

Rutledge testified that he then heard "someone screaming [his] name over and over and over again." When asked by the State if he could tell who was screaming his name, he replied, "I couldn't be for sure. It sounded like [appellant]. I'm not for sure though." He went back to the parking lot and saw appellant and Roberts on their knees, facing each other, with "[a]ll four hands holding a knife that was pinned to the ground." Rutledge told both men to let go of the knife, and when they did not respond, he stepped on the knife and their hands to force them to let go, which they did. He recognized the knife as a knife given to Spring Cypress Car Care by an auto parts company as a Christmas gift. He testified that the shop received several knives and that it was "likely" that appellant received one. After

6

Rutledge kicked the knife away, he stayed with Roberts, who "had several puncture wounds." He testified that he saw one wound on appellant: "a deep laceration in his thumb."

On cross-examination, Rutledge testified that, prior to the incident, appellant had told him that he was no longer friends with Roberts. He testified:

> [Appellant] and I never really talked about them not being friends too much. I—I don't remember exactly where I got the notion that they weren't friends. I just remember it being that they—they were—they used to be friends and they were no longer friends.

Rutledge did not recall seeing Roberts come to the shop on the day before the incident, and he did not think that Roberts's presence at the shop was anything out of the ordinary. He testified that, when he approached them, appellant and Roberts were not fighting or wrestling, but they were both "very still holding this knife."

Kenton Morris, who owned Spring Cypress Car Care, testified that he knew Roberts had been a friend of appellant, but his "understanding [was] that they went from being good friends to enemies." He acknowledged, however, that he would have received any information about their relationship from appellant. Morris was at the shop on the day of the incident, and he testified that appellant was sitting in the office with his head down on the front counter. Morris assumed that appellant's behavior was due to his uncle's funeral the previous day, but appellant mentioned that Roberts "had caused some trouble and that's all that [appellant] said about it." Morris testified that he learned of the incident at issue when

7

appellant entered his office and told him to come out into the garage. He did not witness the altercation itself, but he did see Roberts lying on the ground and he saw a cut on appellant's hand.

Harris County Sheriff's Office ("HCSO") Deputy J. Carson testified that he was on patrol when he received a dispatch concerning an assault at Spring Cypress Car Care. When he arrived, he saw Roberts sitting in front of the shop, holding a towel to his side. He asked Roberts what happened, and Roberts responded that he was stabbed and that the perpetrator was in the shop. At this point, the paramedics arrived and started caring for Roberts, so Deputy Carson walked over to the office area and encountered appellant sitting on the floor of the office. Deputy Carson and appellant walked over to Carson's patrol car, and, after paramedics bandaged the cut on appellant's hand, Carson handcuffed appellant and placed him in the backseat of the patrol car.

Deputy Carson left appellant in the backseat of his patrol car, and he went back over to Roberts. He could not speak to Roberts, due to the paramedics' activities, but he checked for Roberts's identification and discovered a pocketknife in Roberts's pocket. There was no indication that this pocketknife had been used in this incident.[2]

---

[2] Deputy Carson acknowledged on cross-examination that this knife had blood on it, but he later testified that the blood was on the handle, and not the blade, of the

8

HCSO Sergeant J. Dousay testified that he began investigating this case on May 2, 2008, after officers had already collected the preliminary witness statements. Sergeant Dousay spoke with Roberts about the incident, but he did not take an official statement from him. He testified that Roberts was open and straightforward about what had happened and that Roberts' account was consistent with his prior statement and the photographs of the scene. Sergeant Dousay testified that self-defense was not "a factor" in this case "[d]ue to the large number of wounds that [he] saw on the complainant, and especially the large number on his back area."

Appellant testified on his own behalf. He stated that, in December 2007, he gave Roberts's children Christmas gifts and he gave Roberts the knife that was used in the assault.[3] Appellant testified that he and his wife had separated shortly after Christmas, and he discovered that Roberts "had set his cousin [] up" with appellant's wife and that they were dating. After appellant and his wife reconciled, appellant received "many" messages and phone calls from Roberts.[4] Appellant also testified that in February 2008, Roberts and his wife had a bad fight while at a

---

knife and that the presence of blood could be the result of blood flowing from Roberts's numerous wounds and soaking through Roberts's clothes.

[3] Roberts denied that appellant had given him and his family Christmas gifts, and he denied receiving the knife used in the incident from appellant as a gift.

[4] Appellant's wife, Adrianna Rodriguez, also testified that, once she ended her relationship with Roberts' cousin, both she and appellant received "many" harassing phone calls from Roberts.

bar and Roberts left, leaving his wife at the bar. Appellant, who had been drinking heavily, gave her a ride back to his house and offered to let her spend the night in his son's room. The next morning, appellant received an angry and accusatory phone call from Roberts. Appellant later told Rutledge and others at work that he and Roberts were having problems and were no longer friends.

The day before the incident, appellant was at a funeral, and he asked another employee to cover for him at the shop. This employee told him that Roberts had stopped by the shop while he was away. Appellant received a phone call from Roberts while at the funeral, and he testified that he was upset because he had told Roberts several times to stop calling and to leave him and his family alone. Appellant testified that he also told Roberts several times that Roberts should not come to the shop, that Roberts needed to stay away from him, and that he would drop the vacuum hose off at Roberts' wife's parents' house, which was close to appellant's house, so he would not have to see Roberts.

Appellant testified that, on the day of the incident, he was standing in the garage area when he heard the buzzer to the front door, and he opened the door leading into the office area. When he saw Roberts sticking his head in the front doorway, he motioned for Roberts to wait there, and he started walking to his car. Instead of waiting, Roberts followed appellant out to his car. As appellant opened his trunk, Roberts asked, "What's up with [your] phone?" and appellant responded,

10

"You are. All the headaches you're giving me. Leave me alone." Appellant testified that as he leaned into his trunk, he told Roberts that he was "tired of his BS" and that if Roberts did not leave appellant and his family alone, appellant would kill him. According to appellant, Roberts responded, "Oh yeah. I can kill you right now." Appellant heard a click, turned to look at Roberts, and saw Roberts trying to stab him. Roberts cut appellant twice on his hand.

Appellant stated that he started wrestling with Roberts, who was trying to stab him again, and he grabbed the knife out of Roberts's hand. He then grabbed Roberts and "tried to hold him away." At this point, Roberts was hitting appellant in the head and saying, "I've got another knife." Appellant "felt [he] had to do something," so he started stabbing Roberts. Eventually, both men fell to the ground, with Roberts on top of appellant, and they continued to wrestle for the knife. Appellant then started yelling for Rutledge, shouting that he needed help because Roberts was trying to kill him. Rutledge told the men to stop, and when they did not, Rutledge stepped on their wrists and hands to force them to release the knife. Rutledge then kicked the knife away, and appellant ran into the office and told Morris to come outside because Roberts had just tried to kill him. Appellant then stayed inside the office until Deputy Carson arrived.

The trial court included in the written charge an instruction concerning self-defense. The jury found appellant guilty of aggravated assault and, after it found

11

the allegations in an enhancement paragraph true, assessed punishment at eight years' confinement.

## Denial of a Speedy Trial

In his first issue, appellant contends that his constitutional right to a speedy trial was violated because his trial occurred two years and ten months after he was first charged with aggravated assault. The State contends that appellant failed to preserve his speedy trial issue for appellate review because he did not raise this issue before the trial court, but he instead makes this argument for the first time on appeal. We agree with the State.

### A.     The Right to a Speedy Trial

The Sixth Amendment to the United States Constitution guarantees an accused the right to a speedy trial. U.S. CONST. amend. VI; *Barker v. Wingo*, 407 U.S. 514, 515, 92 S. Ct. 2182, 2184 (1972); *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). This right attaches once a person is either arrested or formally charged. *Cantu*, 253 S.W.3d at 280 (citing *United States v. Marion*, 404 U.S. 307, 321, 92 S. Ct. 455, 463–64 (1971)). We analyze constitutional speedy trial claims "on an ad hoc basis" by weighing and balancing the four factors enumerated in *Barker*: (1) the length of the delay; (2) the reason for the delay; (3) the assertion of the right; and (4) the prejudice to the accused. *Barker*, 407 U.S. at 530–33, 92 S. Ct. at 2192–93; *Cantu*, 253 S.W.3d at 280. Although the

12

State bears the burden of justifying the length of the delay, the defendant bears the burden of proving that he asserted the right to a speedy trial and of showing prejudice. *Cantu*, 253 S.W.3d at 280. The defendant's burden "'varies inversely' with the State's degree of culpability for the delay." *Id.* at 280 (quoting *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993)). Thus, "the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial." *Id.* at 280–81.

The *Barker* analysis is triggered by a delay unreasonable enough to be considered "presumptively prejudicial." *Id.* at 281 (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 2690 (1992)). There is no set time period that triggers the analysis. *Id.* Once the *Barker* analysis is triggered, we first weigh the strength of each factor and then balance the weight of the factors "in light of 'the conduct of both the prosecution and the defendant.'" *Id.* (quoting *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002)). No one factor is "either a necessary or sufficient condition to the finding of a deprivation of the right of a speedy trial." *Barker*, 407 U.S. at 533, 92 S. Ct. at 2193. Instead, the four factors are related, and we consider them together along with "such other circumstances as may be relevant." *Id.*; *Cantu*, 253 S.W.3d at 281 ("As no factor

13

possesses 'talismanic qualities,' courts must engage 'in a difficult and sensitive balancing process' in each individual case.").

We dismiss the charging instrument with prejudice only upon finding that the defendant's speedy trial right was "actually violated." *Cantu*, 253 S.W.3d at 281. We must "apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Id.*

### B. *Preservation*

Generally, to preserve a complaint for appellate review, the complaining party must make a timely request, objection, or motion that states the grounds for the ruling sought with sufficient specificity to make the trial court aware of the complaint, and the trial court must rule on the request, objection, or motion. TEX. R. APP. P. 33.1(a)(1)(A), 33.1(a)(2). "Except for complaints involving systemic (or absolute) requirements, or rights that are waivable only . . . all other complaints, whether constitutional, statutory, or otherwise, are forfeited by failure to comply with Rule 33.1(a)." *Neal v. State*, 150 S.W.3d 169, 175 (Tex. Crim. App. 2004) (quoting *Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004)); *see also Marin v. State*, 851 S.W.2d 275, 278–79 (Tex. Crim. App. 1993) (holding that "systemic" requirements generally concern laws affecting jurisdiction and "waivable only" rights, which "are not extinguished by inaction alone," include

right to effective assistance of counsel and right to jury trial), *overruled on other grounds*, *Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997).

The Court of Criminal Appeals has held that a defendant fails to preserve a speedy trial claim for appellate review when he does not raise this claim before the trial court and, instead, raises the argument for the first time on appeal. *See Mulder v. State*, 707 S.W.2d 908, 915 (Tex. Crim. App. 1986) ("The record does not reflect that Claude raised a speedy trial claim in cause no. 22,843, and, as that cause is the case before us we find that no issue is presented because no motion to dismiss [the indictment] was made by Claude in the instant case."); *see also Dunn v. State*, 819 S.W.2d 510, 526 (Tex. Crim. App. 1991) (holding that because defendant raised statutory speedy trial claim before trial court, but not constitutional speedy trial claim, and speedy trial statute was subsequently declared unconstitutional, defendant's constitutional speedy trial claim was not preserved for appellate review).

The intermediate courts of appeals that have addressed the issue of whether a defendant may raise a speedy trial claim for the first time on appeal have held that to preserve the issue for appellate review the defendant must raise his speedy trial claim at or prior to trial. *See, e.g.*, *Fuller v. State*, 224 S.W.3d 823, 826–27 (Tex. App.—Texarkana 2007, no pet.); *Wade v. State*, 83 S.W.3d 835, 838 (Tex. App.—Texarkana 2002, no pet.); *Oldham v. State*, 5 S.W.3d 840, 847 (Tex.

App.—Houston [14th Dist.] 1999, pet. ref'd); *Dean v. State*, 995 S.W.2d 846, 850 (Tex. App.—Waco 1999, pet. ref'd); *Guevara v. State*, 985 S.W.2d 590, 592–93 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd); *Ramirez v. State*, 897 S.W.2d 428, 431 (Tex. App.—El Paso 1995, no pet.); *see also Grimaldo v. State*, 130 S.W.3d 450, 454 (Tex. App.—Corpus Christi 2004, no pet.) (holding, although defendant raised speedy trial issue in trial court, that claim not preserved because defendant failed to obtain evidentiary record from which appellate court could apply, analyze, and balance *Barker* factors).

In *Guevara*, the Fourteenth Court of Appeals reasoned that the opposing view, that an appellant may raise a speedy trial claim for the first time on appeal, is based on a faulty reading of *Barker*. 985 S.W.2d at 592. The court first noted that, in *Barker*, the defendant raised his speedy trial claim in the trial court by filing a motion to dismiss the indictment on speedy trial grounds, and, thus, preservation was not an issue. *Id.* The court then observed that the *Barker* Court had concluded that whether the defendant asserted or failed to assert his speedy trial right, i.e., whether the defendant actually requested a trial or solely moved to dismiss the indictment, is a factor to be considered in the analysis, but the *Barker* Court did not "dissolve the longstanding rule that a defendant must present his objections in the

trial court or waive them on appeal."[5]  *Id.* at 592–93; *see also Wade*, 83 S.W.3d at 838 ("The United States Supreme Court in *Barker* was not faced with an appellant who was asserting his speedy trial claim for the first time on appeal, but one who had delayed until trial the assertion of his speedy trial right. . . . There is no indication the *Barker* Court intended to abrogate the long-standing rule requiring a defendant to object at trial in order to preserve the issue on appeal.").

As several of our sister courts have noted, three of the *Barker* factors—the State's reason for the delay, the defendant's efforts to assert his speedy trial right, or the lack thereof, and the prejudice caused by the delay—cannot be meaningfully developed and properly evaluated on appeal without a hearing in the trial court. *See Wade*, 83 S.W.3d at 838; *Dean*, 995 S.W.2d at 850 ("Because she did not seek a ruling on her constitutional right to a speedy trial, Dean denied the trial court the opportunity to consider [the *Barker*] factors."); *Guevara*, 985 S.W.2d at 593; *see*

---

[5]  In his reply brief, appellant cites the Court of Criminal Appeals' decision in *Dragoo v. State*, 96 S.W.3d 308 (Tex. Crim. App. 2003), for the proposition that "a defendant's failure to assert his speedy trial right does not amount to a waiver of that right."  In *Dragoo*, the defendant filed a motion to dismiss for lack of a speedy trial, albeit the day before the trial was scheduled to begin. *Id.* at 311. The next day, the trial court held a hearing on the motion, denied relief, and commenced the trial. *Id.* Because the defendant waited until the day before trial to file a motion to dismiss the indictment, his delay in raising the speedy trial issue before the trial court was a factor to be considered in whether he was denied his constitutional right to a speedy trial. *Id.* at 314. The Court of Criminal Appeals did *not* hold that a defendant could raise a speedy trial issue for the first time on appeal, and, indeed, it stated, "At the outset, we note that the court of appeals erred in considering the arguments that appellant made for the first time on appeal." *Id.* at 313.

*also Grimaldo*, 130 S.W.3d at 454 ("[A]lthough he raised the speedy trial issue below, there is no meaningful evidentiary record from which we can apply, analyze, or balance the *Barker* factors. We decline to do so on this record."). Furthermore, in *Guevara*, the Fourteenth Court of Appeals observed that, although the right to a speedy trial is guaranteed by both the federal and the Texas constitutions, the United States Supreme Court has held that the defendant "bears *some* responsibility to assert the right" and that "a defendant's failure to assert the right can be an indication that he does not want a speedy trial." *Guevara*, 985 S.W.2d at 593 (citing *Barker*, 407 U.S. at 528, 534–36, 92 S. Ct. at 2191, 2194–95) (emphasis in original). The Fourteenth Court held that "the right to a speedy trial is a right to be implemented upon request, and that it can, therefore, be waived by want of such a request." *Id.*

We agree with our sister courts and hold that, to preserve a speedy trial complaint for appellate review, the defendant must raise the issue in the trial court, either at or prior to trial.[6] *See Wade*, 83 S.W.3d at 838; *Guevara*, 985 S.W.2d at 592–93.

---

[6] As the State points out, in *Mattox v. State*, an unpublished memorandum decision, we addressed the merits of the defendant's speedy trial claim even though he raised the claim for the first time on appeal. No. 01-93-00959-CR, 1995 WL 149276, at *2–3 (Tex. App.—Houston [1st Dist.] Apr. 6, 1995, no pet.). We noted that "[t]otal failure to insist on a speedy trial is not ipso facto determinative of whether the right has been violated." *Id.* at *2 (citing *Phillips v. State*, 650 S.W.2d 396, 400–01 (Tex. Crim. App. 1983)). This 1995 opinion, designated "do not

18

Here, the record reflects that, when the State moved for a continuance on February 2, 2010, appellant announced that he was ready for trial, but he also agreed to a reset of the trial date until May 14, 2010. Appellant then agreed to seven subsequent resets of the trial date. The record does not contain either a motion for speedy trial or a motion to dismiss the indictment for lack of a speedy trial, and there is no indication that appellant ever argued before the trial court that he was being denied his constitutional right to a speedy trial. We therefore conclude that, because he did not raise his speedy trial claim in the trial court, appellant failed to preserve this contention for appellate review.

We overrule appellant's first issue.

## Sufficiency of the Evidence

In his second issue, appellant contends that the State failed to present sufficient evidence to support the conviction in light of contradictory testimony concerning who was the first aggressor in this incident.

---

publish," has no precedential value. *See* TEX. R. APP. P. 47.7(a) ("Opinions and memorandum opinions not designated for publication by the court of appeals under these or prior rules have no precedential value . . . ."). Furthermore, our opinion in *Mattox* noted the difficulties inherent in addressing a speedy trial claim for the first time on appeal. *Mattox*, 1995 WL 149276, at *3 ("We cannot consider the reason for the delay of the trial because appellant did not raise the speedy trial issue at trial, precluding the State from having the opportunity to explain the delay.").

## A.    *Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence).  The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony.  *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008).  A jury may accept one version of the facts and reject another, and it may reject all or any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted).  We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder.  *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  We afford almost complete deference to the jury's determinations of credibility.  *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).  We resolve any inconsistencies in the evidence in favor of the verdict.  *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim.

20

App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

The defendant bears the burden of producing some evidence to support the defense of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The burden of persuasion remains on the State, and it is only required to prove its case beyond a reasonable doubt. *Id.*; *Yarborough v. State*, 178 S.W.3d 895, 903 (Tex. App.—Texarkana 2005, pet. ref'd) ("The State need not specifically disprove the issue of self-defense."). When the appellant has raised a self-defense theory at trial and then challenges the sufficiency of the evidence supporting the conviction on appeal, "we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Williams v. State*, 226 S.W.3d 611, 616–17 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Defensive evidence that is "merely consistent with the physical evidence at the scene" does not render the

21

State's evidence insufficient because "the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914. "A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Id.*; *Williams*, 226 S.W.3d at 616.

### B.    *Aggravated Assault*

To establish that appellant committed the offense of aggravated assault, the State had to prove that appellant (1) intentionally or knowingly caused bodily injury to Roberts and (2) used or exhibited a deadly weapon during the commission of the assault. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a)(2) (Vernon 2011). A "deadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(17)(B) (Vernon Supp. 2011).

A person is justified in using force against another when and to the degree the person reasonably believes the force is immediately necessary to protect the person against the other's use or attempted use of unlawful force. *Id.* § 9.31(a) (Vernon 2011). A person is justified in using deadly force against another in self-defense if the person would be justified in using force under Penal Code section 9.31 and the person reasonably believes that deadly force is immediately necessary

22

to protect the person against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a)(1)–(2)(A) (Vernon 2011).

Appellant acknowledges that he stabbed Roberts multiple times, and he does not contend that the knife used in the incident does not constitute a "deadly weapon." Instead, he argues that the sole contested issue is which participant in the incident attacked first and, thus, whether appellant was justified in his use of deadly force against Roberts. He argues that a rational fact finder, based upon the inconsistencies in Roberts' testimony, the circumstantial evidence, and the testimony of disinterested third parties such as Rutledge and Morris, "could not reject the possibility that *Roberts* initiated the deadly combat that ensued between [appellant] and himself." (Emphasis added.)

Roberts unequivocally testified that appellant was the initial aggressor in this incident. He stated that he was standing at the open trunk of appellant's car, trying to put his vacuum hose into a bag, when appellant responded strangely to his question concerning appellant's cell phone. He saw appellant's hand and something with a point in his pocket, and as Roberts looked up at appellant's eyes, appellant began stabbing him in the back. Roberts testified that he was backed up against the car, but he eventually managed to grab either the knife or appellant's hands, push him, and slam him onto the ground. As Roberts straddled appellant, he stated that appellant was "killing" him, and appellant responded, "I know."

Roberts testified that they both yelled for Rutledge, who, once he appeared on the scene, managed to kick the knife away and end the incident. Roberts sustained eleven stab wounds during this incident, seven on his back, two on his side, and two on his chest and stomach. Roberts denied that there was any "bad blood" between appellant and himself prior to this incident. Roberts did acknowledge that he was not happy with the relationship between his cousin and appellant's wife or with appellant driving Roberts's wife home on his motorcycle after appellant had been drinking.

Appellant testified to the contrary. He stated that he gave Roberts the knife that was used in the incident, which Roberts denied, that he considered his friendship with Roberts over, and that he had told his co-workers that he and Roberts were no longer friends. Appellant testified that, as he and Roberts were standing at the trunk of his car, he told Roberts to leave him and his family alone or he would kill him. Appellant heard a click, and Roberts responded that he would kill appellant right then. According to appellant, Roberts then tried to stab him and succeeded in cutting appellant twice on his hand. Appellant managed to grab the knife from Roberts, and, after Roberts announced that he had another knife, appellant began stabbing Roberts. Appellant stated that he was the only one who yelled for Rutledge and that, after the incident was over, he ran into the office and told Morris that Roberts had just tried to kill him.

24

Self-defense is an issue of fact for the jury to determine. *See Williams*, 226 S.W.3d at 616. In a sufficiency of evidence review, we do not re-evaluate the weight and credibility of the evidence, and we defer to the jury's determinations of credibility. *See Williams*, 235 S.W.3d at 750; *Lancon*, 253 S.W.3d at 705. We presume that the jury resolved all inconsistencies in the evidence in favor of the verdict. *See Clayton*, 235 S.W.3d at 778. Here, although appellant presented evidence that he acted in self-defense, the State presented contradictory evidence that appellant was the initial aggressor. The jury was fully entitled to believe Roberts's version of events over appellant's version. *See Madrigal v. State*, 347 S.W.3d 809, 818 (Tex. App.—Corpus Christi 2011, pet. ref'd) ("Although we agree with Madrigal that there was evidence that would have allowed a jury to find that he acted in self-defense, the jury was free to disbelieve all of such evidence. In fact, there was also evidence to support a finding that he did not act in self-defense."); *Lee v. State*, 259 S.W.3d 785, 792 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) ("Reconciling conflicting testimony is within the exclusive province of the jury.").

Rutledge testified that the knife used in the incident was one of several that had been given to Spring Cypress Car Care and that it was "likely" that appellant had received such a knife. Morris testified that appellant came into the office to tell him about the incident, but he did not state in his testimony that appellant told

25

him that Roberts had just tried to kill him. Although Deputy Carson testified that he found a pocketknife in Roberts's pocket and that this knife had blood on it, he also testified that it appeared to him that this knife was not used in the incident because the blood was located on the handle of the knife, not the blade, which could be explained by the large amount of blood seeping through Roberts's clothing from his eleven stab wounds. Sergeant Dousay testified that he did not consider self-defense to be a factor in this case because of the large number of wounds that Roberts sustained, particularly to his back. The jury was entitled to believe this testimony, which tends to negate appellant's claim of self-defense. *See Sharp*, 707 S.W.2d at 614 (holding that jury may choose to believe or disbelieve witness or any portion of witness's testimony).

We conclude that, when viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt (1) that the State presented sufficient evidence to establish the elements of aggravated assault and (2) against appellant on the issue of self-defense. *See Saxton*, 804 S.W.2d at 914; *Williams*, 226 S.W.3d at 616–17.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.



                                               Evelyn V. Keyes
                                               Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Publish. TEX. R. APP. P. 47.2(b).

27