**Calvin Q. YARBOROUGH, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–05–00067–CR.**

Court of Appeals of Texas, Texarkana.

Submitted Oct. 13, 2005.

Decided Nov. 16, 2005.

Discretionary Review Refused Feb. 15, 2006.

---

Scott Rectenwald, Marshall, for appellant.

Al Davis, Asst. Dist. Atty., Marshall, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

Calvin Q. Yarborough was indicted on charges of aggravated assault in connection with the beating and stabbing of his mother-in-law. A Harrison County jury returned a guilty verdict and assessed

punishment at thirteen years' imprisonment. The trial court imposed sentence in accordance with the jury's verdict. Yarborough appeals, contending the trial court erred by admitting his videotaped statement and by denying his motion for directed verdict. He also contends the jury's rejection of his assertion of self-defense is against the great weight and preponderance of the evidence. Because we conclude that his statement was not a product of custodial interrogation and that the evidence is legally and factually sufficient to support the jury's verdict, we affirm the judgment.

## I. Factual and Procedural History

### A. At the Apartment

The State's evidence showed that Yarborough and Lori Hamm had a daughter together in March 2001, and married the following January. Their marriage was marked by violence, resulting in repeated separations. In April 2003, Lori obtained a protective order against Yarborough. Even then, however, Lori permitted Yarborough to stay at her apartment in Marshall from time to time. On May 14, 2004, Lori took completed divorce papers to the legal aid office in Longview. Her three-year-old daughter, Lauren, was with her. After going to the legal aid office, Lori then did some shopping with her friend, Michelle Brightman, who lived in Longview. After shopping, they returned to Brightman's house, where Yarborough appeared unexpectedly. After visiting with Lori and Lauren for a few minutes, Yarborough left and then Lori and Lauren left. On their way back to Marshall, Lori stopped at a store and called her mother, Linda Wilson, to tell her she was on her way home. As Lori was driving into the parking lot to her apartment, she saw Yarborough driving out. Yarborough flagged her down and told her he wanted to talk to her about "some legal stuff."

After assuring the hesitant Lori that he just wanted to talk, Yarborough assisted in taking their child out of Lori's car and went with Lori to her apartment. Lori testified she told Yarborough to remain outside the door while she put their daughter to bed. However, as Lori entered her apartment, Yarborough pushed his way inside. Yarborough again assured Lori that he had no intentions of hurting her and closed the door. Lori insisted that he leave, but Yarborough sat down on the couch and began trying to persuade Lori to drop the protective order against him.

Lori testified she was to call her mother when she arrived back at her apartment, but she did not do so because she did not want Yarborough to know she had a cell phone. Wilson became concerned that Lori had not called, so she went to Lori's apartment. According to Lori, both she and her mother asked Yarborough again to leave the apartment. As Yarborough was moving toward the door, as though he were leaving, he continued a conversation with Wilson. He then stated he wanted to hug and kiss his daughter before he left. He did so, and Wilson then took the child from him. According to Lori, Yarborough opened the door, but then closed and locked it, stating, "nobody is leaving out of her [sic]." At this point, both Lori and Yarborough were near the door and Wilson was holding her granddaughter in or near the dining area and away from the door.

Yarborough began to assault Lori, beating her with his fists. Wilson, while still holding her grandchild and still located near the dining area, attempted to call the police from her cell phone. Yarborough intervened, knocked the phone away from Wilson, and began to strike Wilson while she still held the child.

Lori then began to attack Yarborough in defense of her mother. At first, Lori hit

Yarborough with her fists, but stated that doing so had little effect on Yarborough's assault of Wilson and, indirectly, their child. Lori then took a pocketknife from her pocket and stabbed Yarborough three times. Lori explained that Yarborough took the knife from her, stabbed her, moved toward Wilson, and also stabbed her. Lori testified that, following the multiple stab wounds, Wilson fell to the floor and Yarborough then returned to the also fallen Lori to kick and stomp her. Yarborough then returned to Wilson in the dining area and kicked her. Lori attempted to get up and get out the door, but Yarborough returned and stabbed her again. Lori was stabbed a total of fifteen times. She testified she believed she had to use the knife to protect her mother from Yarborough. Lori admitted she stabbed Yarborough first.

Wilson's testimony confirmed much of Lori's version of the events. Wilson explained that, when Yarborough began assaulting Lori, she (Wilson) tried to call for help on her cell phone, but Yarborough then struck her in the face as she still held her grandchild. She testified Yarborough then stabbed her four times, beat her in the face, and kicked and stomped her numerous times. The assault resulted in a nearly-detached retina, stab wounds, and several bruises all over her body. Yarborough pointed out an inconsistency between the version of events Wilson stated during her first interview at the hospital and her testimony at trial regarding when she realized the altercation between Lori and Yarborough had drawn blood.

Yarborough's statement, videotaped at the hospital on the evening of these events, was published to the jury. Yarborough told the police that everything had been fine that evening until his mother-in-law arrived. He stated he was never asked to leave the apartment. He explained that he "asked" Wilson about the possibility that her husband had been sexually molesting Yarborough's daughter[1] and that Wilson did not like that conversation. As Yarborough prepared to leave, he hugged his daughter and was in the process of handing her over to Wilson when Lori stabbed him in the shoulder. He then explained that, on realizing he had been stabbed, he pushed his daughter and Wilson aside and was stabbed again while doing so. He took the knife away from Lori and just started swinging. He said he did not know who was stabbed or how many times anyone was stabbed, only that "everybody got stabbed."

In response to questions by the police, he further stated he felt in fear of his life when Lori stabbed him and he saw blood. He stated he was just "trying to get out that door" because he thought Lori had stabbed him in the heart. He kept swinging his fists and the knife until he was able to open the door. He further stated that he had been to Wilson's house earlier that day and that they "had no problem." According to Yarborough's account, there had been no altercation before the point in time at which Lori stabbed him.

Yarborough left and drove himself to the hospital. Lori went to a neighbor's apartment to summon help. All three—Yarborough, Lori, and Wilson—were hospitalized for their wounds.

## B. At the Hospital

Lieutenant Doyle Kuhn and Sergeant Darryl Griffin, detectives for the Marshall

---

1. Sergeant Darryl Griffin, with the Marshall Police Department, testified that he investigated these allegations and that Child Protective Services became involved as well. The child was examined and interviewed at the East Texas Child Advocacy Center. The investigation yielded no evidence to support Yarborough's allegations.

Police Department, interviewed Wilson, Lori, and Yarborough at the hospital that night. No arrests were made because, according to Griffin, the statements given by the persons involved were inconsistent and possibly unreliable because of the severity of their wounds and the nature of their medical treatment. All three—Yarborough, Lori, and Wilson—remained at the hospital that night. After the follow-up interviews with Lori and Wilson a few days later, Griffin sought a warrant for Yarborough's arrest. Yarborough was arrested in Longview five days after the incident.

### C. At Trial

Yarborough was charged with the aggravated assault of Wilson. During the trial, the State sought to admit Wilson's videotaped statement. Yarborough objected to its admissibility on the basis he had not been warned in compliance with Article 38.22 of the Texas Code of Criminal Procedure. The trial court determined that the statement was not made as a product of custodial interrogation and that, therefore, the statement was admissible regardless of compliance with Article 38.22. At the close of the State's evidence, Yarborough unsuccessfully moved for a directed verdict, arguing that the State's evidence conclusively established that Yarborough acted in self-defense.

## II. Admission of Yarborough's Videotaped Statement

### A. Article 38.22 Requirements

Article 38.22 of the Code of Criminal Procedure sets out the conditions to be met before the state may use a suspect's oral statement against him or her:

No oral . . . statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

(1) an electronic recording . . . is made of the statement;

(2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above [2] and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

(3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;

(4) all voices on the recording are identified; and

(5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(a) (Vernon 2005). By its own language, Arti-

---

2. Article 38.22, Section 2(a) provides:

No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:

(a) the accused, prior to making the statement . . . received . . . a warning that:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time. . . .

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2(a) (Vernon 2005).

cle 38.22 does not apply to noncustodial statements: "Nothing in this article precludes the admission ... of a statement that does not stem from custodial interrogation, . . . ." TEX.CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 2005).

### B. Issue of Custodial Interrogation

■■■ A person is in custody only if, under the circumstances, a reasonable person would believe that his or her freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim.App.1996). Texas courts look at four factors when determining whether a person is in custody: 1) probable cause to arrest, 2) subjective intent of the police, 3) focus of the investigation, and 4) subjective belief of the defendant. *Dowthitt*, 931 S.W.2d at 254. The Texas Court of Criminal Appeals has described at least four of the "various and sundry forms" of custody other than formal arrest. *See Shiflet v. State*, 732 S.W.2d 622, 629 (Tex.Crim.App. 1985). Custody can occur when 1) "a suspect is physically deprived of his freedom of action in any significant way, such as being placed in a police vehicle and taken to the station house for questioning," 2) "a person is led to believe, as a reasonable person, that he is deprived of his freedom of movement, such as when a police officer tells him he cannot leave," 3) "if the police create a situation that would warrant a reasonable person in believing that his freedom of movement has been significantly restricted," or 4) "if there is probable cause to arrest and the police do not tell the suspect that he is free to leave." *Id.*

### C. Standard of Review

■■■ Generally, we review the trial court's admission of evidence for an abuse of discretion. *See Montgomery v. State*,

810 S.W.2d 372, 378 (Tex.Crim.App.1990). We afford almost total deference to a trial court's determination of historical facts, especially when the trial court's fact-findings are based on an evaluation of credibility and demeanor. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997); *State v. Oliver*, 29 S.W.3d 190, 191 (Tex. App.-San Antonio 2000, pet. ref'd). Similarly, we afford great deference to the trial court's rulings on application of law to fact questions when resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *See Guzman*, 955 S.W.2d at 89. However, we review de novo mixed questions of law and fact not falling within this category. *See id.* Because the facts surrounding Yarborough's recorded statement are not in dispute, the matter at issue here is whether Article 38.22 applies to Yarborough's videotaped statement, a question of law. We therefore apply de novo review. *See id.; Oliver*, 29 S.W.3d at 191.

### D. Statement Was Not Made As a Result of Custodial Interrogation

■ Kuhn testified that, in interviewing Yarborough at the hospital that night, he did not do anything different from what he did in interviewing Lori and her mother. Griffin's testimony reveals that the preliminary interviews yielded inconsistent stories, calling for further investigation. Further, the context of the interview with Yarborough would not lead a reasonable person to believe that his or her movement was restrained. In response to the detectives' questions, Yarborough recalled his version of the day's events. He also explained his concerns regarding the possibility that his daughter was being sexually molested. The officers said nothing that would indicate Yarborough was under arrest. Yarborough's movement was restrained only to the extent that he was receiving medical treatment for his stab

wounds. There were no threats or statements of coercion. The detectives asked at least twice if Yarborough had gone into "a rage" or "just lost it," and allowed Yarborough to respond and clarify. While the detectives expressed their concern over the number of times Lori was stabbed, there is no indication during the interview that the police had probable cause to arrest Yarborough at that point. In fact, Kuhn indicated that, at that point in the investigation, all three were suspects. After the twenty-minute interview, the detectives concluded their questions and left Yarborough in the hospital's care. It was not until after follow-up interviews with Lori and Wilson a few days after the incident that Griffin sought an arrest warrant for Yarborough. Yarborough was arrested in Longview five days after the hospital interview.

Nothing in the interview or in the record suggests that Yarborough's statement was made in response to custodial interrogation. Therefore, the mandates of Article 38.22 are not applicable. We overrule Yarborough's first point of error.

## III. Sufficiency of Evidence

In one multifarious point of error, Yarborough complains of the trial court's denial of his motion for directed verdict and of the jury's implicit rejection of his theory of self-defense. We read this point of error to challenge the legal and factual sufficiency of the evidence.

### A. Aggravated Assault

A person commits aggravated assault if the person commits assault as defined in

TEX. PEN.CODE ANN. § 22.01 [3] and the person: (1) causes serious bodily injury to another, including the person's spouse; or (2) uses or exhibits a deadly weapon during the commission of the assault. TEX. PEN.CODE ANN. § 22.02 (Vernon Supp. 2005).

### B. Self–Defense Standards and Burdens

To properly focus our review of the evidence, we look to well-established rules concerning the availability and extent of deadly force in self-defense.

#### 1. Use of Force

■ A person is justified in using force against another when and to the degree he or she reasonably believes the force is immediately necessary to protect himself or herself against the other's use or attempted use of unlawful force. TEX. PEN. CODE ANN. § 9.31(a) (Vernon 2003); *see Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim.App.1985). One has the right to defend against a reasonable appearance and apprehension of apparent danger to the same extent as against actual danger. *Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim.App.1984).

#### 2. Deadly Force

Additional requirements apply to the use of deadly force. *See* TEX. PEN.CODE ANN. § 9.31(d) (Vernon 2003). A person is justified in using deadly force against another if the following requirements are satisfied:

---

**3.** Section 22.01 provides that a person commits the offense of assault if he or she:
(1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;
(2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or

(3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.
TEX. PEN.CODE ANN. 22.01(a) (Vernon Supp. 2005).

(1) if he would be justified in using force against the other under Section 9.31;

(2) if a reasonable person in the actor's situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other's use or attempted use of unlawful deadly force; or

(B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

TEX. PEN.CODE ANN. § 9.32(a) (Vernon 2003). From this, we point out that use of deadly force is justified only when retreat is unreasonable.[4] *See Frank,* 688 S.W.2d at 868. The test is whether a reasonable person in the actor's situation would have retreated. *Id.*

### 3. Burdens of Production and Persuasion

 The issue of self-defense is one of fact to be determined by the jury. *See Saxton v. State,* 804 S.W.2d 910, 913 (Tex. Crim.App.1991). Yarborough had the burden to prove by a preponderance of the evidence that he acted in self-defense. *See* TEX. PEN.CODE ANN. § 2.04(d) (Vernon 2003). Once a defendant raises the issue of self-defense, the state then carries the burden to persuade the jury, beyond a reasonable doubt, that the claim of self-defense is not true. The state need not specifically disprove the issue of self-defense. Rather, the burden is incorporated

into the state's burden to prove its case. *See Saxton,* 804 S.W.2d at 913. A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory. *Id.* at 914.

### C. Legal Sufficiency of the Evidence

#### 1. Standard of Review

 A challenge on appeal to the denial of a motion for directed verdict is a challenge to the legal sufficiency of the evidence. *See Canales v. State,* 98 S.W.3d 690, 693 (Tex.Crim.App.), *cert. denied,* 540 U.S. 1051, 124 S.Ct. 806, 157 L.Ed.2d 701 (2003). In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the judgment where the jury is the trier of fact. *Cardenas v. State,* 30 S.W.3d 384, 389–90 (Tex.Crim.App.2000). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Saxton,* 804 S.W.2d at 914.

#### 2. Evidence was Legally Sufficient To Support Jury's Verdict

 Viewing the evidence in a light most favorable to the verdict, we conclude that the record demonstrates the State's evidence was legally sufficient to prove beyond a reasonable doubt each element of aggravated assault against Wilson. Wilson testified Yarborough stabbed her four times with a knife. Griffin testified that he examined the knife and that it was capable of causing serious bodily injury or death. Based on such evidence, the jury could have concluded Yarborough committed aggravated assault against Wilson.

---

**4.** As a matter of law, Yarborough could not have been in retreat at the moment he utilized deadly force. *See Juarez v. State,* 886 S.W.2d 511, 513–14 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd); *see also Bartmess v. State,* 708 S.W.2d 905, 908 (Tex.App.-Tyler 1986, no

pet.) ("The actual use of deadly force necessarily implies no retreat at the moment the force was applied. One may be in retreat and then abandon that retreat by using deadly force.").

■ Contrary to Yarborough's contention, this evidence did not establish he was reasonable in believing that use of force was necessary to protect himself from Wilson. Additionally, Yarborough presented no evidence Wilson threatened him with any amount of force. In his videotaped statement at the hospital, Yarborough explained twice that Wilson had been "standing off to the side" when he leaned toward Wilson to let her have the child when Lori stabbed him. We conclude that the evidence was legally sufficient to support the jury's implicit rejection of Yarborough's theory of self-defense.

**D. Factual Sufficiency of the Evidence**

**1. Standard of Review**

■ Yarborough also argues that the jury's rejection of his assertion of self-defense was against "the great weight and preponderance of the evidence." When a defendant challenges the factual sufficiency of the rejection of a defense, the reviewing court reviews all of the evidence in a neutral light, and we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *See Zuniga v. State*, 144 S.W.3d 477, 484 (Tex.Crim.App.2004); *see also Zuliani v. State*, 97 S.W.3d 589, 595 (Tex.Crim.App. 2003) (specifically outlining the factual sufficiency standard concerning jury's rejection of self-defense).

**2. Factually Sufficient Evidence To Support Rejection of Self–Defense**

■ In Yarborough's videotaped statement, he stated he grew afraid for his life when Lori stabbed him and, believing he had been stabbed in the heart, he just started swinging the knife in an attempt to escape the assault and the apartment.

Of course, the jury was free to accept or reject any or all of Yarborough's evidence. *See Saxton*, 804 S.W.2d at 913. We also emphasize that Yarborough was charged with the aggravated assault of Wilson, not Lori.[5] So, based on the evidence before it, the jury could have concluded that it was not reasonable for Yarborough to believe that use of force was immediately necessary to defend himself from Wilson. The record shows that only Lori stabbed Yarborough and that, even by Yarborough's own account, Wilson stood "off to the side." The record quite clearly shows that Wilson did not act in a threatening way toward Yarborough.

The record shows that Wilson was holding the child while standing in the opposite direction from the door. Yarborough had to move away from the door in order to attack Wilson. For the jury to accept Yarborough's theory of self-defense, it would have to conclude he reasonably believed it was immediately necessary to use force to protect himself against Wilson's use or attempted use of unlawful force. *See* TEX. PEN.CODE ANN. § 9.31(a). The facts that Wilson was holding the child, had no weapon, made no verbal threats, made no physical gestures toward Yarborough, and posed no obstacle to the door directly contradict Yarborough's depiction that Wilson was injured when he started swinging the knife in fear for his life and in an effort to get out of the apartment.

Further, even if Yarborough could have reasonably believed that Wilson. was

---

**5.** We have no indication before us that such charges were ever brought and expressly limit our conclusions to those relating to the charges of aggravated assault of Wilson.

threatening him with deadly force, he is unable to bring forth evidence he could not have retreated. In fact, the record reveals that Wilson was in the opposite direction of the door. So, the jury had before it sufficient evidence to conclude it was unreasonable to attack Wilson with the knife, kick and stomp her, and beat her when he could have retreated. From our review of the record, factually sufficient evidence supports the jury's rejection of Yarborough's theory of self-defense.

We cannot say the evidence of guilt considered by itself is too weak to support the finding of guilt beyond a reasonable doubt, or that the contrary evidence—evidence favoring Yarborough's theory—is strong enough that the State could not satisfy its burden of proof beyond a reasonable doubt. *See Zuniga,* 144 S.W.3d at 484. We therefore conclude that the evidence is both factually and legally sufficient to support the jury's implied finding against Yarborough on the issue of self-defense. We overrule Yarborough's second point of error.

## IV. Conclusion

We conclude that Yarborough's statement at the hospital was not a product of custodial interrogation. Article 38.22, therefore, is inapplicable to his statement. Applying the appropriate standards of review, we hold that the evidence was both legally and factually sufficient to support the jury's implicit finding that Yarborough's conduct was not justified by self-defense.

Accordingly, we affirm the judgment.