**AFFIRM; and Opinion Filed October 26, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-17-01058-CR
No. 05-17-01059-CR
No. 05-17-01060-CR

**XAVIER MANDELL TAYLOR, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 194th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F-1670593-M, F-1670594-M, F-1670595-M**

## MEMORANDUM OPINION

Before Justices Myers, Evans, and Brown
Opinion by Justice Brown

Appellant Xavier Mandell Taylor raises four issues in this appeal of his three convictions

for criminally negligent homicide. Appellant contends there is legally insufficient evidence to

support the convictions and the trial court erred in denying his motion to suppress statements he

made to a police officer and admitting photographs of the accident scene and his Facebook page.

For the following reasons, we affirm the trial court's judgments.

BACKGROUND

A grand jury indicted appellant for manslaughter in three cases after a vehicle appellant

was driving struck another vehicle, killing three passengers. The cases were tried to a jury, and

the jury was charged on both manslaughter, as alleged in the indictments, and the lesser-included

offense of criminally negligent homicide. In each case, the jury found appellant guilty of criminally

negligent homicide and answered a special issue – whether appellant used a deadly weapon, to-wit: a motor vehicle – in the affirmative. The jury assessed punishment at ten years' confinement in each case.

The evidence shows Maricela Mendoza stopped her red Dodge Stratus at the intersection of Peoria Street and Singleton Boulevard, just blocks from her home in Dallas, at 5:25 p.m. on Monday, March 28, 2016. Her four children were in the car with her: Lisbeth, aged three, strapped in a car seat in the middle of the back seat; Brian, aged seven, behind Maricela in the back seat; Pamela, aged eleven, in the back passenger-side seat; and Dulce, aged fourteen at the time of trial, in the front passenger seat. They all wore seatbelts.

Maricela planned to turn left from Peoria onto eastbound Singleton, a six-lane road with a thirty-five mile per hour speed limit. She knew there had been several accidents at the intersection and acknowledged it was difficult to see cars coming from a distance due to a curve on Singleton and fencing. That day, however, Maricela looked to both her right and left twice at the intersection and saw no cars coming. She accelerated into the intersection and, as she crossed the west-bound lanes, saw a white car approaching and a blue or black car then appear and speed past the white car. Maricela thought "he's going to hit me" and tried to increase her speed. Within seconds, she felt an impact. Initially, she was unable to move and could see only the white of her air bag. She then saw Dulce and, through her rear view mirror, observed her other children, who appeared to be sleeping or dead. Brian had blood on his face, and Pamela's leg was "all the way" to her shoulder and sticking out the car's rear window. Maricela got out of the car, but was unable to open Brian's "pushed in" door. She got back in the car, reclined her seat, and tried, but was unable, to get to the children. Next, she remembered Dulce getting out of the car and screaming, "Wake up. Wake up. You cannot be dead."

Dulce testified she also checked for traffic at the intersection and saw no cars coming. She was tired and closed her eyes as her mother entered the intersection. She then felt a "pressure" and heard her mother scream. Dulce removed her seatbelt, turned around, and felt nothing when she tried to find Pamela's pulse. Other people tried to help get her siblings out of the car. Dulce was taken to the hospital by herself in an ambulance and later learned her siblings had died.

Maricela called her husband, Arturo Mendoza. Arturo testified he was aware there had been some accidents in the area of the Singleton-Peoria intersection. He arrived to see his wife's car totally destroyed on one side. Maricela was grabbing Dulce, who was screaming. The other children did not respond to him, and he was unable to remove them from the car. Later, he rode with the children in an ambulance to the hospital, where doctors told him they were dead.

Dallas County medical examiners performed autopsies on Brian, Pamela, and Lisbeth, each of whom died as a result of blunt force injuries. Brian's injuries included external injuries to the face, arms, and legs, lacerations to his lung, liver, and spleen, extensive skull fractures, lacerations to his brain, a transected windpipe, and a severed spinal cord. Pamela had multiple injuries to her head, neck, and trunk, including fractures to the cervical spine, ribs, and pelvis, lacerations to the heart, liver, and spleen, and tears in her heart muscle and the deep tissue structures of her brain. Lisbeth suffered external injures, extensive skull fractures, lacerations of the brain, subdural hemorrhage, pulmonary contusions, and spleen laceration.

Multiple witnesses testified about the accident, appellant's driving, and driving conditions along Singleton. Michelle Sharpe-Anderson was driving home from work westbound on Singleton at thirty to thirty-five miles per hour when a dark car "came out of nowhere" and passed her. She had never seen anyone drive that fast on Singleton or any residential street. Just after Sharpe-Anderson thought "he's going to kill someone," she saw a crash, smoke, fire, and a red car spinning. She stopped and observed people helping the driver of the dark car. The red car was on

the other side of the road, and Sharpe-Anderson saw a little boy's head out a window and a girl's leg out the rear window. She called 911.

Jabsau Yurdan Garcia-Diaz walked out of a towing company on Singleton near Peoria and saw a car traveling really fast. He also saw a red car stop twice and then enter the intersection to make a left turn. According to Garcia-Diaz, the driver of the red car did not have time to see the dark car, which was going too fast. Garcia-Diaz also testified Singleton was a long and big street, which "kind of makes you want to drive a little bit faster."

Leticia Delatorre was driving home from work westbound on Singleton and noticed a black car traveling at a very excessive speed in front of Pinkston High School. She thought the car might have been traveling ninety miles per hour and wondered if the driver was impaired because she could not imagine anybody in their right mind would be driving that speed. Delatorre honked because the car was by a school. The driver of the black car almost caused an accident darting in between a bus and another car. Delatorre lost sight of the car until she drove up to the accident. She heard crying and yelling and saw someone's leg hanging out of a car window.

Donna Montez and her son were traveling east on Singleton and noticed the red car at the Peoria stop sign. As soon as Montez passed Peoria, she heard a bang, looked in her rearview mirror and saw that a black car had hit the red car, which "made doughnuts" to the other side of the road. Montez u-turned, parked, and ran to the red car. Montez testified the daughter in the front seat was screaming and the mother was dazed. The mother then screamed, "My babies, my babies," causing Montez to notice the children in the back seat. The children were not responsive. The baby buckled into the car seat was bleeding, and the other girl was "twisted." The whole drivers' side door was smashed into the boy's body and he was "squashed." It was pretty obvious to Montez that the children were going to die. Montez's son took a picture of the accident scene, which was admitted at trial. The photograph showed Montez leaning into the car checking on the

children and Pamela's leg and an arm protruding from the area of the rear window, which was completely gone. The photograph also reflected extensive damage to the rear and driver side of the vehicle. Montez was aware there was a problem with excessive speed on Singleton in that area. She also was aware that, after the accident, vehicles could no longer turn left at the Peoria intersection.

Adriana Malagon was traveling west on Singleton to make an auto parts delivery about a block from the accident site. A black Nissan Sentra was behind her at a traffic light and, when the light turned green, the Sentra, speeding, swerved in between the lanes until it was in front of all the other cars, where it increased its speed even more. Malagon was concerned, and the traffic soon slowed due to an accident. When she approached the scene, Malagon observed people helping the daughter, who was crying, out of the red car. The driver of the Sentra, also out of his car, was holding his head and limping slightly.

Delisha Evans was riding home from work with her fiancé on Singleton. Her fiancé was driving forty-five to fifty miles per hour when she saw a car pass on her right so fast she thought it had to have been traveling at least eighty-five to ninety miles per hour. Evans traveled the area every day and had never seen anyone drive that fast. Shortly after appellant passed, she heard a loud crash. As they got closer, Evans saw people getting out of their cars and a red car, which had been hit, on the other side of the street.

Elvira Garza, who worked at a tire shop on Singleton, sent her granddaughter to get something from a car. Her granddaughter returned screaming, and Garza went out to see appellant in a black car in the street and, later, the red car. Appellant asked for help, and Garza's granddaughter helped him out of the car and got him a chair. Appellant was worried about getting some papers from the car. He asked "How's the other car doing?" Garza responded, "Not good," and he said he was sorry.

Gregorz Krawieczynski worked nearby and was running an errand in the area. He pulled into the middle westbound lane of Singleton and, ten to fifteen seconds later, a black car passed him going "like 80, 100 miles." The driver was changing lanes in an unsafe manner; Krawieczynski felt the situation was dangerous and an accident might occur. Indeed, within 200 to 300 meters, the driver caused an accident, and Krawieczynski stopped to help the women in the wrecked car.

Tammie Moore, general manager of Kloeckner Metals near the Peoria-Singleton intersection, heard a loud crash and saw a car heading toward the Kloeckner Metals parking lot. Debris was flying in the air, and the car landed on a curb. The car's rear window was completely gone, and a leg stuck out of the window area. The front seat passengers were quiet at first and then started screaming and crying when there was no response from the children in the back seat. Moore opened the back car door to check on the children. The older girl's body was "kind of mangled." Moore called out for Kloeckner Metals operations manager Gregory LeBlanc to help, and he testified that he got on his knees and stuck his head in the car. He saw the little girl's eye twitch, but could not find a pulse. He tried to do some chest compressions until paramedics arrived a few minutes later.

David Flores owned a business at the corner of Peoria and Singleton with surveillance cameras that captured the accident on video. Flores gave police the video, which the State played for the jury. The video recorded the red car stopping at the Peoria-Singleton intersection before pulling out. A dark car then crosses the field of view from left to right extremely fast, striking the red car, which becomes totally obscured by a dense white-gray cloud. When the cloud clears away, neither car is in view but a large area of the six-lane road is covered with debris. The video did not record sound. Flores knew of one other accident at that intersection and several accidents in the area. He testified that vehicle speed on that stretch of Singleton had been a problem for

businesses and residences in the area. After the accident, the City "shut" a lane off, making turns from Peoria onto Singleton right turn only. An additional traffic light was installed nearby too.

Upon arriving at the scene, City of Dallas Fire Department paramedic Albert Garcia, Jr. could tell additional ambulances were necessary. He pushed Pamela's leg back through the rear window and had to cut her seatbelt with a knife to remove her from the car. Garcia then cut Lisbeth's car seat straps and removed her from the car. Emergency medical technicians at the scene began cardiopulmonary resuscitation on the girls. Garcia also cut Brian's seatbelt, but had to use a tool to extricate him from the car because his leg was pinned. By this time, additional ambulances and paramedics had arrived. Garcia testified he could tell the children were not going to survive the accident when he first encountered them.

The first Dallas Police traffic officer on the scene, Edward Giampietro, immediately noticed the accident was not a regular two-car collision. The scene was horrific; there was debris everywhere and it looked like the red car exploded. Giampietro gathered information for the accident report and observed the video from the surveillance cameras. He also spoke with appellant, who said, "She pulled out in front of me. I'm driving down Singleton, and they pulled out in front of me." Appellant also said he "was probably doing 40, 45. Maybe 50." Giampietro, who had worked more than a thousand car accidents, testified that, despite the thirty-five miles per hour speed limit, the average speed in that area of Singleton was fifty to fifty-five miles per hour with sixty or sixty-one miles per hour the fastest he had encountered. Based on the red car's condition, Giampietro believed appellant had been driving at least eighty miles per hour.

Giampietro testified that, while a car could be operated safely at ninety-eight miles per hour on a speedway or a straight, limited access freeway, there was no way driving ninety to ninety-eight miles per hour could be reasonable or prudent on Singleton, a street with business and residential traffic, cars traveling both directions and entering the street, and numerous private

driveways, intersecting roads, and pedestrians. Giampietro and other officers "talked about" criminally negligent homicide charges while at the scene and back at the office but "held that, because [they] "were very sure [it] was going to be a high-speed accident" and wanted to wait until they could review the Sentra's airbag module data. After reviewing that data, they determined to charge appellant with manslaughter.

Dallas Police detective Ronald A. Cathcart could tell the accident was a "pretty high-speed crash" based on the severe damage to the red car, the large debris field, and his experience working thousands of accidents. Cathcart acknowledged a curve in Singleton impeded sight down the road. But, he also testified a car's speed is a factor in its visibility to other drivers. If a car was approaching westbound on Singleton at the speed limit or a low rate of speed, a driver pulling out from Peoria would have no issue seeing it. However, impaired visibility affecting both the driver of the approaching car and the driver of the car pulling out from Peoria would be an issue if the approaching car was traveling at a high speed.

Dallas Police officer Mark Johnson and senior corporal David Frykholm forensically mapped the accident. To Johnson, the wreckage looked more like an explosion than a car accident and indicated one of the vehicles was traveling at an extremely high speed. Frykholm similarly testified the extent of the red car's damage and the distances both cars traveled post-collision indicated "a lot of speed." Both Johnson and Frykholm testified accidents due to speed were common in the area. Johnson also acknowledged there was considerable distance between traffic lights on Singleton.

Officer Michael Phillips executed a warrant to retrieve the air bag control module from the Sentra. A crash data retrieval report showed the Sentra was traveling ninety-eight miles per hour five seconds before the crash. Four seconds before the collision, the Sentra was traveling ninety-six miles per hour; at both three and two seconds before the collision, the Sentra was traveling

ninety-five miles per hour; at 1.5 seconds before the collision, the Sentra was traveling ninety-three miles per hour and, for the first time, the brake was engaged; at one second before the collision, the Sentra was traveling eighty-six miles per hour, and both the accelerator and brake were engaged; and, at the time of the collision, the Sentra was traveling seventy-three miles per hour and both the brake and accelerator were engaged. Officer Cathcart performed an "old-school" reconstruction of the accident and calculated vehicle speeds consistent with the air bag module data.

Dallas police detective Doris Smith assisted at the scene, obtaining evidence, and then went to the hospital, where she interviewed appellant in the emergency room. According to Smith, appellant's attitude was "plain, bland" and "flat." He told her he had been traveling about forty-five to fifty miles per hour in the Sentra and the person driving the red car did not get out of the way in time. The Sentra was a loaner from a car dealership, and appellant had already notified the dealership about the accident. Appellant expressed that he was sorry for the accident and indicated the driver of the red car should use "maybe better judgment next time." He also mentioned a traffic light might be needed in the area.

Michael Wobken, a City of Dallas civil engineer and program manager for traffic signal construction, testified there was no traffic light at Singleton and Weisenberger, three blocks from Peoria, at the time of the accident. A project to install a light, however, was pending at the time, and the accident accelerated the project's timetable. According to Wobken, possible preventative measures were considered after any serious accident. Over three years, there had been nine accidents, three of which were potentially correctible, at Peoria and Singleton. There had been another seven accidents, four of which were potentially correctible, at Singleton and Weisenberger. A speed study indicated that at least eighty-five percent of traffic on Singleton traveled forty-six miles per hour or less.

Frederick Allen, a DART bus driver with a route on Singleton, testified there were a number of driving hazards in the area, including the sun, drivers failing to check for traffic when entering Singleton from side streets, and speed. Although Allen had no knowledge about this particular accident, he had "daily" incidents at Peoria. Since the accident, barriers had been installed to prevent people from making left turns onto Singleton from Peoria, a traffic light was installed at Weisenberger, and some new speed signs were installed.

Leroy Knowling, a private investigator hired by appellant's counsel, took photographs where the accident occurred and made a video while driving Singleton. The photographs and video were admitted into evidence. Knowling noted the stop sign at Peoria was a considerable distance back from Singleton and there was a 1.9 mile stretch of Singleton without a traffic light. The photographs also reflected the barriers installed after the accident to prevent left turns from Peoria onto Singleton.

Appellant, aged twenty-four, testified at trial and explained that he had been concerned about time just before the accident. He had to return the Sentra to a car dealership in Irving and then get to his job in Plano by 8:00 p.m. Appellant did not want to be late and, when traffic on the interstate backed up, took a detour via Singleton. He saw a thirty-mile-per-hour speed limit sign shortly after he got on Singleton. He pulled into a car wash and, after washing the Sentra, returned to Singleton. He did not pay attention to street signs or check his speedometer; nor did he remember almost colliding with either a DART bus or a car. Appellant swerved in and out of traffic to get in front of cars and, because he was pressed for time, choose to drive faster than the speed limit. At the time, he believed he was traveling "50, 60 miles per hour," even though he told police he was driving more slowly. Appellant slammed the brake when he saw the red Stratus in front of him. Although he did not mean to, he also engaged the accelerator because the brake

pedal was too small for his size-thirteen feet. He did not learn the children had died until the next day and was devastated.

When appellant spoke to officer Smith about using "better judgment next time," he also was referring to himself although that was not what he said at the time. He acknowledged the other witnesses at trial had told the truth and having driven ninety-eight miles per hour. Appellant also acknowledged his driver license had been suspended before for driving without insurance and he had prior convictions for driving and running a red light and not wearing a seatbelt as a passenger.

The State asked appellant about his Facebook account and introduced into evidence a photocopy of his Facebook page as it was the day of the accident. Appellant had posted photos of automobiles, including of him in the Sentra, and testified he liked cars and driving. He also posted text including, "I changed my car horn to gunshot sounds. People move out of the way much faster." Appellant's Facebook "intro," which "tell[s] somebody what you're all about," stated "fuck everything & the bullshit & get to this Mf money and Fuk yo feelings & watch out lil bitch idgaf." Appellant explained the posts had been on his Facebook page well before the accident.

SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant contends the evidence is insufficient to support his criminally negligent homicide convictions. Specifically, appellant challenges the evidence to show he should have been aware there was a substantial and unjustifiable risk of death from his conduct or that his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. Appellant relies on evidence that Singleton was a street known for speeding and accidents and the City has since taken measures to remedy the dangerous Singleton-Peoria intersection. Appellant also cites a lack of evidence that he was either distracted or impaired.

In reviewing the sufficiency of the evidence, we consider all evidence in the light most favorable to the jury's verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). We defer to the jury, which must weigh the evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic to ultimate facts. *Jackson*, 443 U.S. at 319; *Queeman*, 520 S.W.3d at 622. We presume the jury resolved any conflicts in favor of the verdict. *Queeman*, 520 S.W.3d at 622. We determine only whether the State presented a legally sufficient case of the offense and the evidence presented supports the jury's verdict. *Id*.

To establish criminally negligent homicide, the State must prove (1) the defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that there was a substantial and unjustifiable risk of death from his conduct; and (3) his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. TEX. PEN. CODE ANN. §§ 6.03(d), 19.05(a); *Montgomery v. State*, 369 S.W.3d 188, 192-93 (Tex. Crim. App. 2012). Because a defendant's failure to perceive the risk of harm is at issue, criminal negligence requires proof of the defendant's awareness of the attendant circumstances leading to the risk, not his awareness of the risk. *Montgomery*, 369 S.W.3d at 193. The attendant circumstances are viewed from the defendant's standpoint at the time the allegedly negligent act occurred. *Id*. "The carelessness required for criminal negligence is significantly higher than that for civil negligence; the seriousness of the negligence would be known by any reasonable person sharing the community's sense of right and wrong." *Id*.

Here, the evidence viewed in a light most favorable to the verdict establishes Singleton was a six-lane road fronted by businesses with nearby residences and schools. Vehicles entered Singleton via a number of intersecting streets and private driveways. The speed limit was thirty-

five miles per hour. Yet, because he was in a hurry, appellant ignored the posted speed limits, swerved dangerously in and out of traffic, and chose to drive as fast as ninety-eight miles per hour, almost three times the posted speed limit, during weekday traffic at 5:25 p.m. Officer Giampietro testified there was no way driving between ninety and ninety-eight miles per hour could be reasonable or prudent on a road like Singleton.

Because it was a busy time of day, multiple witnesses observed, and testified to their concern about, appellant's driving right before the collision. For example, Delatorre thought he might have been driving ninety miles per hour and could not imagine anyone in their right mind driving that speed. Evans testified she had never seen anyone drive that fast. Krawieczynski testified the black car passed him at "like 80, 100 miles" and was changing lanes in an unsafe manner that could result in an accident. Maricela thought appellant was going to hit her. And, Sharpe-Anderson, who had never seen anyone drive that fast on Singleton or any residential street, thought he was going to kill someone. These witnesses, who appellant acknowledged were telling the truth, clearly recognized the extraordinary carelessness of appellant's driving.

The jury also heard considerable evidence of frequent speeding and automobile accidents, visual obstacles, and post-accident traffic control improvements in the area. The jury was free to weigh all of that evidence in drawing reasonable inferences about the circumstances leading up to the accident and appellant's understanding, or lack thereof, of the risk of his conduct in light of those circumstances. We defer to the jury as factfinder. *Queeman*, 520 S.W.3d at 622. And, viewing all the evidence in the light most favorable to the verdict, we conclude a rational jury could have found appellant's failure to appreciate the substantial and unjustifiable risk, given the circumstances at the time of the accident, was a gross deviation from the standard of care that an ordinary person would exercise under the same circumstances. *See, e.g., Thompson v. State*, 676 S.W.2d 173, 176-77 (Tex. App.—Houston [14th Dist.] 1984, no pet.) (evidence legally sufficient

–13–

to support criminally negligent homicide when it demonstrated defendant was driving twenty miles per hour above speed limit in a residential neighborhood near a bus stop early in the morning); *Cooks v. State*, 5 S.W.3d 292, 295-96 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (affirming manslaughter conviction with speeding forty-five miles per hour over limit); *cf. Queeman*, 520 S.W.3d at 630 (due to lack of evidence defendant was speeding excessively, a rational jury could not have concluded he grossly deviated from the usual standard of care in driving). Accordingly, we conclude there is legally sufficient evidence to support appellant's criminally negligent homicide convictions. We overrule appellant's first issue.

### MOTION TO SUPPRESS

In his second issue, appellant contends the trial court erred in denying his motion to suppress the statements he made to officer Smith in the hospital because Smith did not *Mirandize* him. Appellant maintains Smith's questioning was a custodial interrogation because the police, having already determined appellant was driving the Sentra and his speed was the likely cause of the accident, planned to charge appellant with, at least, criminally negligent homicide. Appellant also asserts he was not in a position to walk out of the hospital and Smith did not tell him he was free to leave.

We review a trial court's denial of a motion to suppress for an abuse of discretion, applying a bifurcated standard of review. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). We defer to the trial court's determination of historical facts that are based on assessments of credibility and demeanor. *Id*. We review de novo questions that do not turn on credibility and demeanor, including whether the historical facts constitute custodial interrogation. *Id*.

Statements made by a defendant during a custodial interrogation are inadmissible if, before making the statements, the defendant did not receive warnings set out in *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), and the code of criminal procedure. *See Herrera v. State*, 241 S.W.3d 520,

–14–

525-26 (Tex. Crim. App. 2007); TEX. CRIM. PROC. art. 38.22, § 3(a)(2). The defendant bears the initial burden to prove a statement was the product of a custodial interrogation. *Herrera*, 241 S.W.3d at 526.

The meaning of "custody" is the same for purposes of *Miranda* and article 38.22. *Id.* Generally, four situations may constitute custody: (1) the defendant is physically deprived of his freedom of action in any significant way; (2) a law-enforcement officer tells the defendant he is not free to leave; (3) law-enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted; or (4) there is probable cause to arrest the defendant, and law-enforcement officers do not tell him he may leave. *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009); *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). Under the first three situations, the restriction on the defendant's freedom of movement must reach "the degree associated with an arrest" instead of an investigative detention. *Dowthitt*, 931 S.W.2d at 255. Under the fourth situation, an officer's knowledge of probable cause must be manifested to the defendant and the record also must demonstrate "other circumstances of the interview, such as duration or factors of the exercise of police control over [the defendant], would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Saenz v. State*, 411 S.W.3d 488, 496 (Tex. Crim. App. 2013) (citing *Dowthitt*, 931 S.W.2d at 255).

The trial court conducted a hearing outside the presence of the jury to determine the admissibility of appellant's statements, and only officer Smith testified. Smith testified she did not *Mirandize* appellant because he was not in custody at the time. She spoke to him to "make sure of his status as far as his injuries and find out if he was the driver." Although she was aware other officers at the scene had formed an opinion that the black car struck the red car and speed might have contributed to fatalities, the investigation had not been completed and no decision had

been made as to any kind of charges. Smith further testified the fact that an accident involved either a suspected high rate of speed or a fatality did not necessarily mean criminal charges would be filed. At the conclusion of the hearing, appellant objected that, although officers may not have made a "formal official decision" to charge appellant, they knew there would be criminal charges before the interview and, under those circumstances, he should have been *Mirandized*. The trial court denied appellant's motion.

Although officers determined the speed of the black car driven by appellant was likely a factor in the accident, the investigation had not been completed and no decision had been made as to any kind of charges. During the interview, which lasted less than five minutes, Smith said nothing to indicate appellant was either under arrest or a suspect. *See Herrera*, 241 S.W.3d at 525–26. Nor is there evidence that any other circumstances of the interview would lead a reasonable person to believe he was under restraint to the degree associated with an arrest. *See Saenz*, 411 S.W.3d at 496. The restraint, if any, on appellant's ability to leave the hospital was due to medical treatment he was receiving and was not initiated in any way by law enforcement. *See Martinez v. State*, 496 S.W.3d 215, 219-20 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *Yarborough v. State*, 178 S.W.3d 895, 901-02 (Tex. App.—Texarkana 2005, pet. ref'd). Accordingly, appellant did not meet his burden of showing he was in custody when he was questioned and, therefore, the trial court did not err in denying his motion to suppress. We overrule appellant's second issue.

ADMISSION OF PHOTOGRAPHS

In his third and fourth issues, appellant contends the trial court abused its discretion in admitting photographs of the accident scene and his Facebook page. Evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence. TEX. R. EVID. 401. Relevant evidence may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. TEX. R. EVID. 403. The balance between probative value and the potential for prejudice "is always slanted toward admission, not exclusion, of otherwise relevant evidence." *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). We review a trial court's decision to admit photographs into evidence for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007).

In his third issue, appellant contends an accident scene photograph was highly prejudicial and only had the potential to inflame the jurors. The State introduced the photograph during Montez's testimony describing what she observed and did at the scene. Montez's son took the photograph, in which Montez is leaning into the red Stratus and checking on the children. The photograph also shows the extensive damage to the car and, as several witnesses testified to seeing, Pamela's leg protruding up out of the area of the rear window, which was completely gone.

Generally, photographs are admissible if verbal testimony about the matters depicted in the photographs would be admissible and their probative value is not substantially outweighed by any of the Rule 403 counter-factors. *See Gallo*, 239 S.W.3d at 762. A trial court, however, does not abuse its discretion simply by admitting into evidence a gruesome photograph. *See Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995); *see also Shavers v. State*, 881 S.W.2d 67, 77 (Tex. App.—Dallas 1994, no pet.) ("The fact that the scene depicted in the photograph is gory and gruesome does not make the photograph more prejudicial than probative when the crime scene is gory and gruesome."). Factors to consider in determining whether the danger of unfair prejudice substantially outweighs the probative value of photographs include the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. *Gallo*, 239 S.W.3d at 762.

Here, the photograph, although disagreeable to see, is relevant, providing an accurate visual illustration of a portion of the accident scene in the aftermath of the collision. *See Sonnier*, 913 S.W.2d at 519; *see also Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) ("The photographs are gruesome in that they depict disagreeable realities, but they depict nothing more than the reality of the brutal crime committed."). Further, the photograph depicts the subject of Montez's testimony, as well as the testimony of other witnesses, allowing the jury to test the credibility of that testimony. *See Chamberlain*, 998 S.W.2d at 237; *see also Alami v. State*, 333 S.W.3d 881, 890 (Tex. App.—Fort Worth 2011, no pet.) (trial court did not err by admitting post-collision photograph showing interior of victim's vehicle with deceased victim lying in passenger seat). The trial court, weighing the rule 403 factors, could have reasonably concluded the probative value of this single photograph was not substantially outweighed by its inflammatory nature, if any. Accordingly, we conclude the trial court did not abuse its discretion in admitting the accident scene photograph. We overrule appellant's third issue.

In his fourth issue, appellant contends the trial court erred in admitting a photograph of his Facebook page. On appeal, appellant cites Rules 401 and 403 and argues the photograph was not relevant, had the tendency to confuse the jury, and could only lead the jury to decide guilt/innocence on an improper basis. At trial, however, appellant objected only that the photograph of the Facebook page "had no relevance to this case whatsoever." Because appellant did not object to the photograph on a Rule 403 basis at trial, we do not consider that portion of his argument on appeal. *See* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(1); *Sony v. State*, 307 S.W.3d 348, 356 (Tex. App.—San Antonio 2009, no pet).

Appellant's Facebook page reflects, as he testified to, an interest in cars and driving. It also includes text that could indicate a careless and self-interested attitude generally and, specifically, with regard to driving. Thus, the trial court could have concluded the photograph was

some evidence of appellant's mental state relevant to the jury's determination whether appellant should have been aware of the risks he was taking and/or his failure to perceive those risks. Accordingly, we conclude the trial court did not abuse its discretion in admitting the photograph. We overrule appellant's fourth issue.

We affirm the trial court's judgments.

/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

171058F.U05

–19–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

XAVIER MANDELL TAYLOR, Appellant

No. 05-17-01058-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1670593-M.
Opinion delivered by Justice Brown;
Justices Myers and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 26th day of October, 2018.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

XAVIER MANDELL TAYLOR, Appellant

No. 05-17-01059-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1670594-M.
Opinion delivered by Justice Brown;
Justices Myers and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 26th day of October, 2018.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

XAVIER MANDELL TAYLOR, Appellant

No. 05-17-01060-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1670595-M.
Opinion delivered by Justice Brown;
Justices Myers and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 26th day of October, 2018.